Katrina Carroll (katrina@csclassactions.com)
Kyle Shamberg (kyle@csclassactions.com)
**CARROLL SHAMBERG LLC**
200 North LaSalle, Suite 1650
Chicago, IL 60601
Phone: 872-215-6205

William J. Edelman
Michael A. Acciavatti
**MILBERG, PLLC**
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
(771) 474-1121
wedelman@milberg.com
macciavatti@milberg.com

*Counsel for Plaintiff and the Putative Class*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT WILSON, individually and on behalf of all others similarly situated, | ) | Case No. 26-cv-12502 |
| Plaintiff, | ) | **CLASS ACTION COMPLAINT** |
| v. | ) | **JURY TRIAL DEMANDED** |
| SPACEXAI CORP., f/k/a X.AI CORP., a Nevada corporation; and SPACEXAI LLC, f/k/a X.AI LLC, a Nevada limited liability company, | ) | **INJUNCTIVE RELIEF DEMANDED** |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Scott Wilson ("Plaintiff"), individually and on behalf of all others similarly situated, through undersigned counsel, files this Class Action Complaint against Defendants SPACEXAI CORP., formerly known as X.AI CORP., and SPACEXAI LLC, formerly known as X.AI LLC (together, "xAI" or "Defendants"). The allegations that follow rest on Plaintiff's

personal knowledge as to matters concerning Plaintiff; on counsel's investigation; and on information and belief as to Defendants' proprietary systems and practices, which are matters within Defendants' knowledge and will be the subject of discovery.

## INTRODUCTION

1. Each person carries biometric identifiers that are unique to that person and by which that person can be identified. The geometry of a person's face is one of them.

2. The Illinois General Assembly has explained why such identifiers warrant special protection: "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 ILCS § 14/5(c).

3. Illinois addressed those concerns in its Biometric Information Privacy Act ("BIPA"), 740 ILCS § 14/1, *et seq.* Among other things, BIPA bars a private entity from collecting, capturing, obtaining, disclosing, redisclosing, disseminating, or profiting from an individual's biometric identifiers or biometric information unless the entity has given written notice to, and secured a written release from, the affected individual or that individual's authorized representative. BIPA further obligates private entities in possession of biometric identifiers to adopt retention and destruction policies and to take measures to prevent the release of that information.

4. Defendants develop and operate the generative artificial-intelligence service marketed as "Grok." At relevant times, and in violation of BIPA, Defendants collected, captured, and otherwise obtained scans of the facial geometry of thousands of Illinois citizens. Grok's own

observable functionality confirms how: when a Grok user uploads a photograph showing a human face and asks Grok to analyze, rate, edit, transform, or generate content based on that face, Defendants' systems find the face, examine how its features are configured, and create and use a face-specific representation that measures, maps, or otherwise encodes that face's geometry — including, on request, the proportions, symmetry, angles, and spatial relationships among the eyes, nose, lips, jaw, and facial contour. Defendants possessed those biometric identifiers and that biometric information without having adopted or published any policy, written or otherwise, governing their retention and destruction.

5. Plaintiff does not contend that a photograph, by itself, is a biometric identifier under BIPA. BIPA's definition of "biometric identifier" excludes photographs themselves. What Plaintiff challenges is something different: when Grok conducts face-specific analysis or identity-preserving image manipulation, Defendants collect, capture, derive, or otherwise obtain a scan of face geometry and/or biometric information that is distinct from the photograph from which it came.

6. Defendants did all of this (a) without telling the affected individuals — Plaintiff and the members of the proposed class (the "Class," and its members, "Class Members") among them — that their biometric identifiers were being collected, captured, and otherwise obtained; (b) without informing those individuals in writing of the specific purpose and length of term for which their biometric identifiers and information were being collected, captured, and obtained; and (c) without seeking or obtaining written releases from those individuals or their authorized representatives.

7. As the Illinois General Assembly has found, and as the Illinois Supreme Court has confirmed, Plaintiff and Class Members have already been harmed by the BIPA violations alleged in this Complaint.

8. Companies around the world are competing to build ever more advanced artificial-intelligence and facial-analysis technology, and the resulting race for data endangers the privacy of individuals everywhere. Illinois public policy holds that, in light of the risks of unwanted data collection and disclosure, Illinois citizens need the power to decide what becomes of their unique biometric identifiers and information. Defendants' conduct took that power away from Plaintiff and Class Members.

9. Defendants' conduct has a further direct consequence. Each individualized scan of a person's facial geometry is generated within — and can be traced back to — the authenticated Grok account used to upload the source photograph, along with the account holder's identifying information and conversation history. As a result, the biometric identifiers and information collected, captured, and otherwise obtained from Plaintiff and Class Members can be connected to the specific, identified individuals from whom they were taken, subjecting Plaintiff and Class Members to increased surveillance, stalking, identity theft, social engineering (a type of hacking technique), and other invasions of privacy and fraud. Defendants' conduct has also directly resulted in Plaintiff's and Class Members' biometric identifiers and information no longer being under their control. These injuries are imminent and clearly impending, and they are in addition to the injuries Plaintiff and Class Members have already sustained because of Defendants' conduct.

10. Through this Class Action Complaint, Plaintiff seeks: (a) statutory damages of $5,000 for each BIPA violation or, in the alternative, $1,000 for each BIPA violation if Defendants acted negligently, together with attorneys' fees and costs; (b) disgorgement of the ill-gotten gains

Defendants derived from using the unlawfully acquired data; and (c) an injunction that (i) prohibits Defendants from making any further use of individuals' biometric identifiers and information; (ii) prohibits Defendants from continuing to collect, capture, obtain, and profit from Plaintiff's and Class Members' biometric identifiers and information without complying with BIPA; (iii) compels Defendants to delete and destroy all biometric identifiers and information in their possession, custody, and control; and (iv) compels Defendants to develop and make publicly available a BIPA-compliant retention schedule and destruction policy.

## PARTIES

11. Plaintiff Scott Wilson is, and at all relevant times was, a resident and citizen of Illinois residing in New Berlin, Sangamon County, Illinois. Defendants performed scans of Plaintiff's facial geometry from photographs that Plaintiff uploaded to Grok while physically present in Illinois.

12. Defendant SpaceXAI LLC — formerly known as X.AI LLC prior to its February 2026 acquisition by Space Exploration Technologies Corp. ("SpaceX") — is a limited liability company organized under Nevada law that conducts substantial business throughout Illinois, including in Cook County. The Grok Terms of Service and Privacy Policy identify SpaceXAI LLC as the party with which Grok users contract and as the entity responsible for the personal information that Grok collects. On information and belief, Defendant SpaceXAI Corp. wholly owns SpaceXAI LLC. Under its former name, X.AI LLC, SpaceXAI LLC is registered with the Illinois Secretary of State to transact business in Illinois, including in Cook County.

13. Defendant SpaceXAI Corp. — formerly known as X.AI Corp. prior to its February 2026 acquisition by SpaceX — is a Nevada corporation that conducts substantial business throughout Illinois, including in Cook County. The corporation's name was changed from X.AI

Corp. to SpaceXAI Corp. on or about August 13, 2026. On information and belief, until February 2, 2026, SpaceXAI Corp. was a wholly owned subsidiary of X.AI Holdings Corp., which merged into and became part of SpaceX on that date; SpaceXAI Corp. is now, on information and belief, a wholly owned subsidiary of SpaceX. SpaceXAI Corp. manages and controls the operations of SpaceXAI LLC.

14. After SpaceX acquired the xAI business and that business was publicly rebranded as "SpaceXAI," X.AI Corp. and X.AI LLC rebranded to SpaceXAI Corp. and SpaceXAI LLC, respectively, on or about August 13, 2026. As of the date of this Complaint, Defendants publish Grok's Terms of Service, Privacy Policy, and Acceptable Use Policy at the x.ai domain under the name "SpaceXAI." The documents, policies, and public statements issued during the Class Period under the names "xAI," "X.AI Corp.," and "X.AI LLC" were issued by the Defendants named in this Complaint under their former names. If the Grok business has been transferred to, or is operated by, any successor or affiliate entity, Plaintiff intends to amend this Complaint to name that entity.

15. Together, Defendants own, control, and operate the artificial-intelligence model and product Fwilcalled Grok, including the features through which it understands, analyzes, edits, and generates images. On information and belief, Defendants jointly developed the Grok family of artificial-intelligence models at issue; function as a single, integrated enterprise in developing, operating, and monetizing Grok; have common ownership, officers, and management; and each participated in, directed, authorized, or controlled the conduct alleged in this Complaint. Each Defendant is a "private entity" as that term is defined in 740 ILCS § 14/10.

## JURISDICTION AND VENUE

16. The Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one Class Member is a citizen of a State different from that of at least one Defendant, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the Class has 100 or more members. Plaintiff is an Illinois citizen, and no Defendant is. Defendants are organized under Nevada law and maintain principal places of business in Texas and/or California. *See* 28 U.S.C. § 1332(c)(1), (d)(10). The amount in controversy is well above $5,000,000 because the Class is estimated to include thousands of members and Defendants' intentional and reckless BIPA violations are punishable by statutory damages of $5,000 per violation. To the extent any claim asserted in this Complaint falls outside the Court's original jurisdiction, the Court has supplemental jurisdiction over it under 28 U.S.C. § 1367(a).

17. Plaintiff and Class Members have standing under Article III. By collecting, capturing, and retaining their biometric identifiers without the notice and written release that BIPA requires, Defendants denied them the opportunity to consider whether, and on what terms, to allow Defendants to obtain their biometric data, and took from them control over their immutable biometric identifiers. That deprivation is a concrete and particularized injury closely related to harms traditionally recognized at common law, including intrusion upon seclusion. Defendants' unlawful retention of Plaintiff's and Class Members' biometric identifiers — and their failure to develop, publicly disclose, and comply with a retention schedule and destruction guidelines — likewise inflicts a concrete privacy injury.

18. Defendants are subject to personal jurisdiction in this Court. Defendants purposefully direct Grok to Illinois residents and transact business with them; accept and process

photographs and prompts sent from Illinois; return Grok's outputs to users located in Illinois; and sell paid Grok subscriptions to Illinois residents. X.AI LLC is also registered to transact business in Illinois. The biometric identifiers and information that Defendants collected, captured, and otherwise obtained were derived directly from photographs created in Illinois, uploaded from Illinois, and managed through Illinois-based user accounts, computers, and mobile devices, and Defendants thereby exposed Illinois residents to ongoing privacy risks within Illinois. Defendants knew or had reason to know that collecting, capturing, and obtaining the biometric identifiers and information of Illinois citizens and residents without the required notice or releases would deprive those citizens and residents of their statutorily protected privacy rights, neutralize their ability to control access to their biometric identifiers and information through their Illinois-managed devices, and expose them to potential surveillance and other privacy harms as they went about their lives in the state. Plaintiff's claims arise directly from these Illinois-directed contacts.

19. The BIPA transactions involving Plaintiff took place primarily and substantially in Illinois. Plaintiff was physically present in Illinois when accessing Grok, uploading the relevant photograph(s), submitting the relevant prompts, and receiving Grok's face-specific analysis and/or edited outputs. This is not a case about a dataset that third parties assembled and a defendant later obtained. The collection challenged here happens in a direct, real-time transaction between the Illinois user and Defendants: the Illinois user sends the photograph to Defendants; Defendants process it and return the output to the Illinois user; and the privacy injury caused by Defendants' failure to obtain BIPA-compliant consent is suffered in Illinois.

20. Venue lies in this District under 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction.

## ILLINOIS BIOMETRIC PRIVACY LAWS

21. The purpose of BIPA is to protect individuals' biometric identifiers and biometric information.

22. A scan of an individual's face geometry is a biometric identifier. 740 ILCS § 14/10. While the definition of "biometric identifier" excludes photographs themselves, BIPA separately protects face-geometry data that is extracted or created from a photograph. *See id.*

23. The statute defines biometric information as "any information . . . based on an individual's biometric identifier used to identify an individual." 740 ILCS § 14/10.

24. Among other things, BIPA: (a) prohibits a private entity, such as Defendants, from collecting, capturing, or otherwise obtaining an individual's biometric identifiers and information without providing written notice and obtaining a written release; (b) prohibits such an entity from selling, leasing, trading, or otherwise profiting from an individual's biometric identifiers and information; (c) prohibits such an entity from disclosing, redisclosing, or otherwise disseminating an individual's biometric identifiers or information except in the circumstances the statute specifically sets forth; and (d) requires such an entity, to the extent it possesses biometric identifiers or information, to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying those identifiers and that information. 740 ILCS § 14/15.

25. BIPA creates a private right of action under which a prevailing party may recover liquidated damages of (a) $1,000 or actual damages, whichever is greater, for negligent violations of its provisions; and (b) $5,000 or actual damages, whichever is greater, for intentional or reckless violations of its provisions. 740 ILCS § 14/20. A prevailing party may also recover attorneys' fees and costs and obtain injunctive relief. 740 ILCS § 14/20.

## FACTUAL ALLEGATIONS

### I. Facts Specific to Plaintiff Wilson

26. Plaintiff Wilson resides in Illinois and is an authenticated Grok user and was a paid subscriber from approximately August 2025 through February 2026. Plaintiff's Grok account is linked to identifying account information, including Plaintiff's name, email address, and other profile information.

27. During his time as a subscriber in August 2025 through February 2026, while physically present in Illinois, Plaintiff accessed Grok using an Illinois-based Internet connection and Plaintiff's authenticated account.

28. Plaintiff uploaded to Grok photograph(s) showing Plaintiff's own face (the "Plaintiff Photos"). The Plaintiff Photos were taken in Illinois, were stored in Illinois on Plaintiff's mobile device and were transmitted to Defendants' servers while Plaintiff was physically present in Illinois.

29. Plaintiff asked Grok to modify the Plaintiff Photos. In each instance, Grok processed and modified Plaintiff's photograph, including Plaintiff's face, to produce the requested output, while preserving Plaintiff's recognizable facial features and unique identity.

30. On information and belief, and as with every Class Member, Defendants captured biometrics from the Plaintiff Photos by automatically locating and scanning Plaintiff's face and extracting geometric data about its contours and about the proportions of, and spatial relationships among, facial landmarks such as Plaintiff's eyes, nose, mouth, jaw, and facial contours. Defendants then used that biometric information to generate the identity-preserving edited image(s) that Grok returned to Plaintiff, as described more fully below.

31. On information and belief, the facial biometric data Defendants captured was unique to Plaintiff's own facial features and was therefore capable of identifying Plaintiff. That data was also created and used within Plaintiff's authenticated account session, and Defendants held account information capable of linking the representation to Plaintiff's real-world identity.

32. Defendants never (a) told Plaintiff, in writing or otherwise, that they were scanning Plaintiff's facial geometry; (b) informed Plaintiff, in writing or otherwise, of the specific purpose and length of term for which they were collecting, capturing, obtaining, storing, and using Plaintiff's biometric identifiers and information; or (c) sought or received from Plaintiff or Plaintiff's authorized representative a written release permitting Defendants to collect, capture, or obtain Plaintiff's biometric identifiers and information.

33. At no time did Plaintiff consent, agree, or give permission — in writing or otherwise — for Defendants to collect or store Plaintiff's unique biometric identifiers or biometric information. When Plaintiff asked Grok to edit Plaintiff's facial image, Plaintiff had no knowledge that Defendants used face-processing architecture to extract Plaintiff's biometric data.

34. Defendants possessed Plaintiff's biometric identifiers and information at least during the time they were processing the Plaintiff Photos and generating the edited image(s) and, on information and belief, kept that data and the associated image-processing context beyond the instant of collection. Defendants made no written, BIPA-compliant retention schedule or destruction policy governing that data available to Plaintiff.

35. As alleged above, Defendants' conduct has injured Plaintiff and exposes Plaintiff to further injuries that are imminent and certainly impending.

## II. Defendants' Unlawful Practices

### A. The Grok Service and How It Processes Faces

36. Grok is the name of Defendants' family of multimodal artificial-intelligence models and consumer-facing services, which can process and generate text, images, audio, video, and code. Defendants introduced Grok publicly in 2023, initially integrated into the X (formerly Twitter) platform. Today Grok is offered through the grok.com website, standalone Grok mobile applications for iOS and Android, the X platform, and application programming interfaces ("APIs") that developers use to build Grok's capabilities into third-party applications.

37. Grok is a commercial product. Defendants sell paid subscription tiers — including "SuperGrok" and, through the X platform, "Premium" and "Premium+" subscriptions — that give subscribers expanded access to Grok's features, its image features among them. As of March 2026, Grok reportedly had approximately 117 million monthly active users worldwide.

38. A user must be signed in to upload a photograph to Grok. Each uploaded photograph travels over the internet to computer servers that Defendants own, operate, or control; is processed on those servers; and yields an output that is transmitted back to the user. None of the challenged processing takes place on the user's own device.

39. Defendants gave Grok image-understanding ("vision") capabilities in October 2024, enabling users to upload photographs and ask Grok questions about them. By March 2025, Defendants had added the ability to edit uploaded photographs using natural-language prompts. Defendants launched "Grok Imagine," an image- and video-generation product, in August 2025. And in December 2025, Defendants added to the X platform an "Edit Image" function that lets any user apply Grok's image editing to any publicly posted image, including photographs of other people.

40. Grok's image system is code-named "Aurora." Defendants have described it as "an autoregressive mixture-of-experts network trained to predict the next token from interleaved text

and image data," trained on "billions of examples from the internet." According to Defendants, Aurora has "native support for multimodal input, allowing it to take inspiration from or directly edit user-provided images." Defendants advertise "Realistic portraits" and "Celebrities" among Aurora's supported capabilities, along with the ability to render "precise visual details" of real-world subjects.[1]

41. Defendants have since released successor image and video models. These include the Grok Imagine API (announced January 28, 2026), Grok Imagine "Quality Mode" (May 2026), and Grok Imagine 1.5 (June 3, 2026), an image-to-video model that Defendants describe as turning "a single still image into fluid, cinematic video" while staying faithful to the source image.

42. Defendants' developer documentation for Grok's image-understanding capability states that a user may submit an unlimited number of images. That documentation contains no policy, restriction, or guidance of any kind concerning images of people or human faces.

**B. Grok Scans and Measures the Geometry of Faces in Uploaded Photographs and Reports the Results**

43. One common and widely documented use of Grok is to generate so-called "aesthetic reports." A user obtains such a report by uploading a photograph of a face and asking Grok to analyze and rate the facial structure, proportions, symmetry, and individual features of the person depicted.

44. Grok responds with a structured, feature-by-feature assessment of the face. Working from an uploaded close-up photograph of a face, Grok generates a report that can include, *inter alia*: an assessment of bone structure and framework, including the width and forward projection of the jawline, cheekbone prominence, midface breadth, and overall craniofacial

[1] *Grok Image Generation Release*, xAI (Dec. 9, 2024), https://x.ai/news/grok-image-generation-release.

structure; an assessment of symmetry; an assessment of proportions and harmony, including the "facial thirds" (hairline to brow, brow to nose base, nose base to chin), ramus height, and gonial angle, along with observations based on them; an assessment of the eyes, including their canthal tilt; an assessment of the nose, including its dimensions; and an assessment of the lips and mouth, including vermilion show and the philtrum.

45. The terms Grok uses in these assessments are the standard vocabulary of craniofacial anthropometry — the measurement of spatial relationships among anatomical landmarks on the human face. By way of example: "facial thirds" refers to the vertical proportions of the face, measured between the hairline, brow, base of the nose, and chin; "gonial angle" refers to the angle the mandible forms at the corner of the jaw; "ramus height" refers to the vertical distance of the mandibular ramus, from the uppermost point of the condyle down to the bottom corner of the jaw angle; "canthal tilt" refers to the angle of the line connecting the inner and outer corners of the eye; "nasal base" width refers to the distance between the outer edges of the nostrils; "dorsum projection" describes the profile of the bridge of the nose; and facial "symmetry" compares the positions and dimensions of paired features on the left and right sides of the face. Every one of these is a measurement of face geometry.

46. To report a person's gonial angle, Grok must have located the corner of that person's jaw and computed its angle. To report a person's facial thirds, it must have located that person's hairline, brow, nose base, and chin and computed the distances between them. And to assess symmetry, it must have located paired features and compared their positions. Grok's output is thus direct evidence that Defendants' systems scanned the geometry of the depicted face in the course of generating the facial assessment.

47. Grok's own descriptions of its face analysis, given to users, confirm that its measurements of specific facial geometry are no mere coincidence. Grok itself explains, for example, that when it analyzes a face for these purposes it directly sees the uploaded image. According to Grok, it does not guess; it processes the pixels with a well-trained visual system, drawing on training in facial anatomy and anthropometry and facial thirds and phi ratios. Grok has also explained that it carries out a systematic breakdown consisting of, *inter alia*, bone structure and projection, vertical and horizontal proportions, symmetry analysis, and feature-by-feature evaluation (eyes, nose, jaw, lips, etc.). Having performed that analysis, Grok is capable of providing the technical version of it, with specific measurements it can estimate from the photo.

48. Grok also makes targeted edits to, and transformations of, uploaded photographs while keeping the depicted person's identity recognizable. Grok can, for example, change a person's facial expression, add or remove facial hair, alter the person's apparent age, or place the person in a different scene — all while keeping the person recognizably the same. Grok has described this functionality to users as a "sophisticated generative edit that understands facial anatomy and muscle movements," in which "[t]he model keeps the person's identity . . . as consistent as possible while only altering" the requested attributes.

49. To change individual facial attributes while keeping the person recognizably the same, a system must distinguish the subject from the surrounding image, localize the face, and carry forward through the transformation the unique, identity-bearing structure of that particular face — the shape and relative positions of the eyes, nose, mouth, jaw, and facial contour — in a form sufficient to re-render that specific individual's face in the output. A representation sufficient to reproduce a recognizable rendering of a particular individual's face is, by its nature, a

representation of that individual's face geometry, and one capable of distinguishing that individual from others.

50. Defendants' own marketing confirms that Grok's image models encode the identity-bearing facial characteristics of specific individuals. Defendants advertise "Celebrities" as a supported use case, and when Grok is prompted to generate images of recognizable public figures, the person in its outputs remains readily identifiable based on facial appearance.

51. Grok has confirmed that, when it alters a facial image as discussed above, it references the original image the user uploaded using that image's unique ID. On information and belief, uploaded photographs and the face-specific data derived from them are stored on Defendants' servers under persistent identifiers, and remain available to Defendants' systems across multiple turns of a conversation and within the user's stored conversation history.

52. Defendants' Privacy Policy confirms that Grok conversations — uploaded images included — are retained by default. The Privacy Policy describes a separate "Private Chat" mode in which conversations are deleted within 30 days, which indicates that conversations outside that mode, along with the images and outputs they contain, are retained for longer than 30 days. The Privacy Policy also provides that Defendants use personal information, including User Content such as "images," "to train our models," and the Terms of Service provide that a user "can select whether or not" Defendants use the user's User Content "to improve our products and services and train our models."[2]

53. The precise internal architecture Defendants use to perform these functions is proprietary and known only to Defendants. Unlike other developers of comparable artificial-

[2] SpaceXAI, *Privacy Policy* §§ 2, 3, 5 (eff. Aug. 24, 2026), https://x.ai/legal/privacy-policy; SpaceXAI, *Consumer Terms of Service* § 4 (updated Sept. 11, 2026), https://x.ai/legal/terms-of-service.

intelligence systems, Defendants have not published any description of how Grok processes images of people. For instance, Defendants' published model cards for Grok 4, Grok 4 Fast, Grok 4.1, and Grok 4.20 contain no description of the image-processing architecture and no evaluation of any safeguard relating to faces or the identification of individuals.

54. Defendants' systems may compute an explicit set of facial landmarks and the distances and angles among them. Or, as is common in modern multimodal artificial-intelligence models, they may convert the region of the image containing the face into a high-dimensional numerical representation from which the structure of the face and the identity of the depicted person can be recovered. Either way, the result is the same: to report facial proportions, angles, and symmetry, and to re-render a specific person's face, Defendants' systems create, capture, obtain, and use a face-specific digital representation that measures, maps, or otherwise encodes the geometry of the depicted face. Published, peer-reviewed research confirms that general-purpose multimodal artificial-intelligence models of the kind Defendants deploy encode identity-distinguishing facial information: one such model, with no face-specific training, has previously been shown to determine whether two photographs depict the same person at accuracy comparable to or exceeding that of human examiners.[3]

55. That internal representation is separate from the photograph itself. Plaintiff seeks no relief based merely on Defendants' receipt of an ordinary photograph. Plaintiff's challenge is to Defendants' extraction, creation, capture, collection, possession, and use of the face-specific biometric representation derived from the photograph.

---

[3] *See, e.g.*, Robin S.S. Kramer, *Face to Face: Comparing ChatGPT with Human Performance on Face Matching*, 54 Perception 65, 65–67 (2025), https://doi.org/10.1177/03010066241295992.

56. Grok's challenged functionality is directed to the human face itself, and in that respect differs from technology that merely creates a whole-image hash to determine whether two image files are duplicates. Grok locates the face; measures and reports its proportions, angles, and symmetry; performs targeted facial edits; and preserves a particular person's recognizable identity across transformed outputs.

57. In addition, on information and belief, Grok can determine whether two photographs presented to it depict the same individual — a further demonstration that the facial data Grok processes is sufficient to identify and track a specific person.

### C. The Facial Representations Grok Creates Can Identify Plaintiff and Class Members

58. The biometric data that Grok collects is capable of identifying the person from whom it was collected.

59. When a user signs into Grok through X, Defendants receive account-linked information such as a profile image, username, numeric account identifier, date of birth, and Grok conversation history. When a user signs in through grok.com or the Grok mobile applications, Defendants collect the user's name, contact information, account credentials, and date of birth, together with payment information for paid subscriptions and technical data including the user's IP address and device type.

60. Where an authenticated user uploads a photograph of himself or herself and expressly identifies the person depicted as "me," "my face," or the account holder, Defendants can connect the face-specific representation derived from that image to the identified account, with no need to discover the subject's identity from scratch.

61. Independently, the geometric representation of a person's face that Grok creates — the proportions, angles, and symmetry of the person's features, and the identity-bearing structure

Grok preserves through its edits — is intrinsically unique to that person and is itself capable of being used to identify him or her, whether alone or in combination with other information available to Defendants.

62. On information and belief, Defendants use or can use the facial representation to keep identity consistent within a chat or image-editing workflow, to distinguish the depicted person from others, to locate the person's face within an image, and to preserve that same person's recognizable identity across generated or edited outputs.

### D. Defendants Obtain Written Releases for Facial Data When They Choose To — But Not from Grok Users

63. Public reporting about an internal xAI initiative called "Project Skippy" shows both that Grok was trained on facial biometric data and that Defendants are familiar with facial-data collection and consent procedures. According to that reporting, in 2025 Defendants asked employees designated as "AI tutors" to have their faces recorded during conversations in order to train Grok and Grok-related products on their facial expressions. Defendants asked those employees to sign release forms granting Defendants perpetual, worldwide rights to use, reproduce, and distribute their faces and voices. Employees who objected were reportedly told that participation was a job requirement tied to xAI's mission.[4]

64. At a minimum, Project Skippy shows that Defendants trained Grok on human facial expressions; that they understand the distinction between ordinary audiovisual material and specifically collected facial data; that they regard facial data as valuable for developing Grok; and that they know how to obtain written releases for facial data when they choose to do so.

---

[4] See Victor Tangermann, *Leaked Documents Show xAI Employees Were Alarmed by Something They Were Asked to Do at Elon Musk's AI Startup*, Futurism (July 22, 2025), https://futurism.com/leaked-documents-xai-employees-alarmed (reporting on Business Insider's account of Project Skippy).

65. Yet Defendants give Grok users no BIPA-compliant written disclosure before Grok performs the challenged facial processing. Defendants do not tell users that Grok will create, capture, collect, or otherwise obtain a scan of face geometry or biometric information from an uploaded photograph; do not state the specific purpose and length of term for which that biometric data will be collected, stored, and used; and do not obtain a written release from the subject before collection. Neither Plaintiff nor any Class Member executed a written release by creating a Grok account or by accepting Defendants' Terms of Service or Privacy Policy. Neither document discloses that Defendants collect, capture, or otherwise obtain biometric identifiers or biometric information — much less the specific purpose and length of term of any such collection — and a user cannot give "informed written consent," by electronic signature or otherwise, to a practice that has never been disclosed to him or her. *See* 740 ILCS § 14/10 (defining "written release").

66. Defendants' public Privacy Policy does not cure that failure. The Privacy Policy nowhere mentions "face," "facial," "face geometry," "biometric identifier," or "biometric information," and it contains no retention schedule or destruction guideline for biometric data and no mechanism for obtaining a written release. The closest it comes is a statement that Defendants "do not aim to collect sensitive personal information (ex., information related to racial or ethnic origin, political opinions, religion or other beliefs, health, biometric scans, criminal background, or trade union membership) and ask that you do not provide us with any such information." That language does nothing to disclaim Grok's capture and use of biometric data from each uploaded face that it processes, as alleged in this Complaint. On the contrary, by identifying "biometric scans" as "sensitive personal information," Defendants acknowledge that they understand the sensitivity of such data — yet they designed and market Grok to locate, measure, and re-render the faces in users' photographs without giving the notice or obtaining the release that BIPA

requires. The analysis is not changed by the Privacy Policy's statement that, "in relation to Grok's training," no "uploaded image [is] used for identification purposes." That statement appears in a sentence expressly addressing Grok's training, and it says nothing about the face-specific processing Grok performs in response to user prompts.[5]

67. Defendants further violated BIPA because, although they are private entities in possession of Plaintiff's and Class Members' biometric identifiers and information, they failed to adopt or make available to the public a retention schedule or guidelines for permanently destroying those identifiers and that information once the initial purpose for collecting them had or has been satisfied.

68. Defendants also violated BIPA because, on information and belief, they profited from Plaintiff's and Class Members' biometric identifiers and information. Defendants sell paid subscriptions providing access to the very image-analysis and image-editing features through which the biometric identifiers are captured, and their Privacy Policy and Terms of Service provide that User Content, including uploaded images, is used to train and improve Defendants' commercial models unless the user opts out.

69. Defendants violated BIPA intentionally and recklessly or, in the alternative, negligently. Defendants knew that facial biometric data is sensitive and that consent is needed to collect it: their own Privacy Policy identifies "biometric scans" as sensitive personal information, and in connection with Project Skippy they sought written releases from their own employees before collecting those employees' facial data. Defendants nevertheless chose to collect, capture, and otherwise obtain Grok users' face geometry without providing any notice or obtaining any release.

---

[5] SpaceXAI, *Privacy Policy* § 2 (eff. Aug. 24, 2026), https://x.ai/legal/privacy-policy.

### III. The Injuries and Damages Sustained by Plaintiff and Class Members

70. As alleged in this Complaint, Defendants' unlawful conduct has already injured Plaintiff and Class Members and exposes them to many more imminent and certainly impending injuries, which they will continue to suffer.

71. Among other things, Defendants' unlawful conduct has (a) caused Plaintiff's and Class Members' unique biometric identifiers and information to be collected, captured, and otherwise obtained without the required notice having been given and without the required releases having been obtained; and (b) deprived Plaintiff and Class Members of the very control over their biometric identifiers and information that BIPA was designed to protect.

72. Plaintiff and Class Members still do not know whether, where, or for how long Defendants have retained their biometric identifiers and information; whether that data has been used to train Defendants' models; or which individuals or entities have received, obtained, accessed, or otherwise made use of it. They are thereby exposed to the imminent and certainly impending injuries of identity theft, fraud, stalking, surveillance, social engineering, and other invasions of privacy.

73. Because of Defendants' misconduct, Plaintiff and Class Members have no recourse for the compromise of their biologically unique information. Plaintiff and Class Members are also likely to withdraw from biometric-facilitated transactions and other facially-mediated electronic participation.

## CLASS ACTION ALLEGATIONS

74. Plaintiff brings this action individually and as a class action under Federal Rule of Civil Procedure 23, seeking damages and equitable relief on behalf of the following Class, for which Plaintiff seeks certification:

> All Illinois residents who, during the Class Period, while located in Illinois and logged into an authenticated Grok account, uploaded to Grok a photograph depicting their own face and used Grok to analyze, rate, edit, transform, or generate content based on that face.

75. The Class excludes: (a) Defendants; (b) any parent, affiliate, or subsidiary of Defendants; (c) any entity in which Defendants have a controlling interest; (d) any of Defendants' officers or directors; (e) any successor or assign of Defendants; and (f) any person who executed a BIPA-compliant written release before the challenged collection. The Class also excludes any judge or court personnel assigned to this case and the members of their immediate families.

76. The "Class Period" runs from the date on which Defendants first made available to Illinois users Grok functionality that accepts and processes user-uploaded photographs — which, on information and belief, was on or about October 2024 — through the date of class certification.

77. Plaintiff reserves the right, after an opportunity to conduct discovery, to amend or modify the class definition with greater specificity or division.

78. ***Numerosity.*** The exact number of Class Members is not presently known. But Grok has approximately 117 million monthly active users worldwide, a substantial number of them reside in Illinois, and Grok's image-analysis and image-editing functionality has been widely used. Plaintiff estimates that Class Members number in the thousands. The proposed Class is therefore so numerous that joinder of all members is impracticable, consistent with Rule 23(a)(1). Class Members can be identified through objective means, including objective data available to Defendants regarding authenticated account records, account-profile data, IP address and geolocation records, uploaded-image logs, prompt and conversation logs, and feature-use records. Class Members can be notified of the pendency of this action through recognized, Court-approved

methods of notice, which may include U.S. mail, electronic mail, internet postings, social media, and/or published notice.

79. ***Commonality and predominance.*** Questions of law and fact are common to all Class Members, and those common questions predominate over any questions affecting only individual members of the proposed Class. They include, without limitation:

a. Whether the Grok face-specific functionality challenged here detects and processes facial geometry;

b. Whether Plaintiff's and Class Members' biometric identifiers and information were collected, captured, and otherwise obtained by Defendants;

c. Whether Plaintiff's and Class Members' biometric identifiers and information were in Defendants' possession;

d. Whether the facial representations that Defendants create can identify Plaintiff and Class Members;

e. Whether Defendants profited from Plaintiff's and Class Members' biometric identifiers and information;

f. Whether Defendants gave the notice BIPA requires before collecting, capturing, and otherwise obtaining Plaintiff's and Class Members' biometric identifiers and information;

g. Whether, before collecting, capturing, and otherwise obtaining Plaintiff's and Class Members' biometric identifiers and information, Defendants obtained written releases from Plaintiff and Class Members or their authorized representatives;

h. Whether, while in possession of Plaintiff's and Class Members' biometric identifiers and information, Defendants had in place — and had disclosed to the public — the written retention and destruction policies BIPA requires;

i. Whether Defendants violated BIPA negligently, or intentionally or recklessly; and

j. Whether Plaintiff and Class Members are entitled to damages, equitable relief, and other relief.

In addition, Defendants' public statements and Grok's uniform operation give no reason to believe that Defendants treated any photograph on which Grok performed a facial geometric scan differently from any other with respect to: (a) how Defendants obtained the photograph; (b) the biometric identifiers and information collected, captured, and otherwise obtained from it; (c) Defendants' failure to give the required disclosures to Plaintiff and Class Members or their authorized representatives; (d) Defendants' failure to obtain the required releases from Plaintiff and Class Members or their authorized representatives; or (e) the absence of a written, publicly available retention and destruction schedule. Put simply, whether Defendants violated BIPA's requirements is a question that can be answered uniformly for every Class Member, Plaintiff included.

80. ***Typicality.*** Plaintiff's claims are typical of those of the Class Plaintiff seeks to represent, because Plaintiff and every member of the proposed Class suffered similar injuries from the same practices alleged in this Complaint. Plaintiff has no interests to advance that are adverse to those of the other members of the proposed Class.

81. ***Adequacy.*** Plaintiff will fairly and adequately protect the interests of the proposed Class, and has retained counsel experienced in class actions and complex litigation.

82. ***Superiority.*** A class action is superior to the other available means of fairly and efficiently adjudicating this dispute. Although meaningful on an individual basis, the injury each Class Member suffered may not be large enough to make individual actions against Defendants economically feasible. And even if Class Members could afford to litigate individually, those actions would place an immeasurable strain on the court system, and individual litigation of the legal and factual issues in this case would increase delay and expense for all parties and the court system. A class action, by contrast, presents far fewer management difficulties and offers the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

83. Alternatively, the proposed Class may be certified because:

a. Separate actions prosecuted by individual members of the proposed Class would create a risk of inconsistent adjudications that could establish incompatible standards of conduct for Defendants;

b. Individual actions could produce adjudications that, as a practical matter, would be dispositive of the interests of non-party Class Members or would substantially impair their ability to protect those interests; and

c. Defendants acted or refused to act on grounds generally applicable to the proposed Class, making final and injunctive relief appropriate as to the members of the proposed Class.

84. Particular issues — namely, the common questions described above — are also appropriate for certification under Rule 23(c)(4), because resolving them would advance the disposition of this matter and the parties' interests in it.

## CLAIMS FOR RELIEF

### COUNT ONE
### (VIOLATION OF BIPA – 740 ILCS § 14/15(a))

85. Plaintiff repeats and incorporates by reference all paragraphs of this Class Action Complaint as if fully set forth here.

86. As alleged above, Defendants violated BIPA by possessing Plaintiff's and Class Members' biometric identifiers and information without having developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and information.

87. Defendants also violated BIPA by failing to comply with any such retention schedule and destruction guidelines and, on information and belief, by keeping Plaintiff's and Class Members' biometric identifiers and information after the initial purpose for collecting them — generating the requested analysis or edited image — had been satisfied, including in stored conversation histories and, on information and belief, in data used to train Defendants' models.

88. Defendants committed these BIPA violations intentionally and recklessly or, in the alternative, negligently.

89. Plaintiff and Class Members have suffered, and will continue to suffer, injury as a direct and proximate result of Defendants' BIPA violations.

90. As monetary relief, Plaintiff and Class Members seek the greater of $5,000 or actual damages or, in the alternative, $1,000 or actual damages.

91. Unless this Court enjoins and restrains it, Defendants' wrongful conduct will continue to inflict great and irreparable injury on Plaintiff and Class Members, because their biometric identifiers and information can be viewed and used by unauthorized persons. Plaintiff

and Class Members have no adequate remedy at law for their injuries, because a judgment for monetary damages will not end the misuse of their biometric identifiers and information.

92. Plaintiff and Class Members additionally seek injunctive relief and their reasonable attorneys' fees, costs, and expenses relating to this action.

**COUNT TWO**
**(VIOLATION OF BIPA – 740 ILCS § 14/15(b))**

93. Plaintiff repeats and incorporates by reference all paragraphs of this Class Action Complaint as if fully set forth here.

94. As alleged above, Defendants violated BIPA by collecting, capturing, and otherwise obtaining individuals' biometric identifiers and information — those of Plaintiff and Class Members included — without giving the required written information and without obtaining the required written releases.

95. In particular, before collecting or otherwise obtaining Plaintiff's and Class Members' biometric identifiers and information, Defendants did not inform them in writing that a biometric identifier or biometric information was being collected or stored, in violation of 740 ILCS § 14/15(b)(1); did not inform them in writing of the specific purpose and length of term for which their biometric identifiers or biometric information were being collected, stored, and used, in violation of 740 ILCS § 14/15(b)(2); and did not receive a written release executed by them, in violation of 740 ILCS § 14/15(b)(3).

96. Defendants committed these BIPA violations intentionally and recklessly or, in the alternative, negligently.

97. Plaintiff and Class Members have suffered, and will continue to suffer, injury as a direct and proximate result of Defendants' BIPA violations.

98. As monetary relief, Plaintiff and Class Members seek the greater of $5,000 or actual damages or, in the alternative, $1,000 or actual damages.

99. Unless this Court enjoins and restrains it, Defendants' wrongful conduct will continue to inflict great and irreparable injury on Plaintiff and Class Members, because their biometric identifiers and information can be viewed and used by unauthorized persons. Plaintiff and Class Members have no adequate remedy at law for their injuries, because a judgment for monetary damages will not end the misuse of their biometric identifiers and information.

100. Plaintiff and Class Members additionally seek injunctive relief and their reasonable attorneys' fees, costs, and expenses relating to this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Scott Wilson, individually and on behalf of the Class, respectfully requests that the Court grant the following relief:

a. An order certifying the Class as requested in this Complaint;

b. An order appointing Plaintiff as Class representative and Plaintiff's undersigned counsel as Class counsel;

c. Damages for Plaintiff and the members of the proposed Class, including liquidated damages under 740 ILCS § 14/20 of $5,000 for each intentional or reckless violation of BIPA or, in the alternative, $1,000 for each negligent violation;

d. Equitable, injunctive, and declaratory relief for Plaintiff and the members of the proposed Class, including an injunction that (i) prohibits Defendants from making any further use of individuals' biometric identifiers and information; (ii) prohibits Defendants from continuing to collect, capture,

obtain, and profit from Plaintiff's and Class Members' biometric identifiers and information unless and until Defendants comply with BIPA; (iii) compels Defendants to delete and destroy all biometric identifiers and information in their possession, custody, and control; and (iv) compels Defendants to develop and make publicly available a BIPA-compliant retention schedule and destruction policy;

e. Pre-judgment and post-judgment interest for Plaintiff and the members of the proposed Class, as permitted by law;

f. Reasonable attorneys' fees and costs of suit, including expert witness fees, for Plaintiff and the members of the proposed Class; and

g. Such further relief for Plaintiff and the members of the proposed Class as the Court deems proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 12, 2026

Respectfully submitted,

By: /s/ *Katrina Carroll*

Katrina Carroll
Kyle Shamberg
**CARROLL SHAMBERG LLC**
200 North LaSalle, Suite 1650
Chicago, IL 60601
Phone: 872-215-6205
katrina@csclassactions.com
kyle@csclassactions.com

William J. Edelman
Michael A. Acciavatti
**MILBERG, PLLC**

227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
(771) 474-1121
wedelman@milberg.com
macciavatti@milberg.com

*Counsel for Plaintiff and the Putative Class*